# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 14-3078

STEPHEN AND MICHELE MCKEAN,

*Plaintiff-Appellant,*

v.

NATIONWIDE INSURANCE COMPANY,

*Defendants-Appellees.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE MIDDLE DISTRICT OF PENNSYLVANIA*
*Case No. 3:12-cv-01206*
*HONORABLE ROBERT D. MARIANI*

## BRIEF OF APPELLANTS
## STEPHEN AND MICHELE MCKEAN

Jeffrey P. Resnick
SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: (856) 662-0700
Facsimile: (856) 488-4744
*Counsel for Plaintiffs/Appellants*
*Stephen and Michele McKean*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................ii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES FOR REVIEW ...........................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ...............1

STATEMENT OF THE CASE..............................................................1

STATEMENT OF FACTS ....................................................................2

STATEMENT OF ARGUMENT...........................................................24

LEGAL ARGUMENT..........................................................................25

    A.   Many Evidentiary Rulings Made By The Trial Court Were in Error
        Which Prejudiced The Jury From Fairly Answering The Jury
        Interrogatories.................................................................25

    B.   The Trial Court Should Have Disqualified The Entirety Of Mr. Jackson's
        Testimony Due To The Defendant's Failure To Provide The Entire Claim
        File, Including Mr. Jackson's Interview With Plaintiff Stephen
        McKean.........................................................................29

    C.   The Trial Court Erred In Allowing The Entire 911 Call To Be Heard By
        The Jury Because It Had Ruled That Evidence Of Fires At Other
        Properties Owned By Plaintiffs Was Irrelevant And
        Prejudicial .....................................................................32

    D.   The Trial Court Erred In Allowing Defendant's Fire And Arson Expert
        To Testify Regarding A Rag Because There Was No Mention Of A Rag
        In His Pre-Trial Report ..................................................36

E.    The Trial Court Erred By Not Allowing The McKeans To Refute
      Thomas Jones' Opinions On Cross-Examination With Certain "Junk
      Science" Articles Refuting His Methodology In Investigating The
      Fire ...................................................................................................38

F.    The Trial Court Committed Reversible Error By Instructing The Jury
      That Defendant's Counsel's Question Characterizing The Fire Loss
      Scene A "Crime Scene" Was Appropriate .............................................43

CONCLUSION.........................................................................................................47

CERTIFICATE OF COMPLIANCE.......................................................................48

CERTIFICATE OF SERVICE .................................................................................49

# TABLE OF AUTHORITIES

**Page**

## STATE CASES

Augustine v. Delgado. 332 Pa.Super. at 199, 481 A.2d at 321 (Pa.R.Civ.P. 4003.5 favors liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise); Martin v. Johns-Manville Corp., 322 Pa.Super. at 358, 469 A.2d at 659 ([W]e have found experts' reports to be adequate ... when the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness) ................................................................................................................37

Wilkes-Barre Iron & Wire Works, Inc. v. Pargas of Wilkes-Barre, Inc., 348 Pa. Super. 285, 502 A.2d 210, 212-213 (Pa.Super. 1985).............................................37

## FEDERAL CASES

Blancha v. Raymark Indus.,
972 F.2d 507, 514 (3d Cir. 1992)
(quoting 22 Charles A. Wright & Kenneth W. Graham, Jr.,
Federal Practice and Procedure: Evidence § 5166, at 74 n.47 (1978)) ..................33

Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.,
110 F.R.D. 363, 367 (D. Del. 1986)
(citing Nat'l Hockey League, 427 U.S. at 642)......................................................30

Daubert v. Merrell Dow Pharms.,
509 U.S. 579, 589 ....................................................................................................38

Estate of Spear v. Comm'r of Internal Revenue Serv.,
41 F.3d 103, 109 (3d Cir. 1994) (citing Ins. Corp. of Ireland v. Compagnie Des
Bauxites, 456 U.S. 694, 707, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982))...............38

Hamilton v. Emerson Elec. Co.,
133 F. Supp. 2d 360, 374-75, (M.D. Pa. 2001) ................................................38, 39

Heller v. Shaw Industries, Inc.,
167 F.3d 146, 153 (3d Cir. 1999) ...........................................................................39

Lentz v. Mason,
32 F. Supp. 2d 733, 745 (D.N.J. 1999),
citing 4 Weinstein's Evidence Section § 702.05[3] .................................................38

Mercedes-Benz, 225 F.R.D.
498, 506; Wachtel, 2006 U.S. Dist.
LEXIS 88563, 2006 WL 3538935, at *20(citing Meyers, 559 F.2d at 904).
See also Quinn v. Consolidated Freightways Corp. of Delaware
283 F.3d 572, 577 (3d Cir. 2002) ...........................................................30

Monger v. Cessna Aircraft Co.,
812 F.2d 402, 406 (8th Cir. 1987) .........................................................32

Nat'l Hockey League v. Metro Hockey Club,
427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) ...........................29, 30

Outley v. Goetz,
837 F.2d 587, 592 (2nd Cir. 1988)..........................................................32

Paoli II, 35 F.3d at 742, In Re TMI, 193 F.3d 613, 664 (3d Cir. 1999)......38, 39, 40

Pineda v. Ford Motor Co.,
520 F.3d 237, 247 (citing In re Paoli, 35 F.3d 717, 742) .......................................38

Smith v. State Farm Fire & Casualty Co.,
633 F.2d 401, 403 (5th Cir. 1980), citing
United States v. Beechum, 582 F.2d 898 (5th Cir. 178) (en banc).....................34, 35

Sucharski v. Patel,
2014 U.S. Dist. LEXIS 2713, 70-71 (E.D. Pa. Jan. 8, 2014) .................................36

United States v. Anton,
597 F.2d 371, 374 (3d Cir. 1979) ...........................................................44

United States v. Blair,
456 F.2d 514, 519 (3d Cir. 1972) ...........................................................45

United States v. Gaines,
450 F.2d 186, 189 (3d Cir. 1971) ...........................................................45

United States v. Price,
458 F.3d 202, 205 (3d Cir. 2006) ............................................................25

United States v. Reynolds,
715 F.2d 99, 101 (3d Cir. 1983) ............................................................25

Ware v. Rodale Press, Inc., 322 F.3d 218, 222 (3d Cir. 2003). See also Adams v.
Trustees of the New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863,
874 (3d Cir. 1994) (finding prejudice from the withholding of relevant information
through non-cooperation in the discovery and costs incurred to obtain court orders
to obtain compliance); Wachtel, 2006 U.S. Dist. LEXIS 88563, 2006 WL 3538935,
at *21; Wortman v. Brown, No. 05-1411, 2006 U.S. Dist. LEXIS 21222, 2006 WL
1044787, at *3 (D.N.J. 2006)............................................................30, 31

Warner v. Transamerica Ins. Co.,
739 F.2d 1347 (8th Cir. 1984) (where court affirmed ruling that where there was no
evidence to suggest that the prior fire was of incendiary origin or that plaintiff had
anything to do with starting it, the evidence's slight probative value was
outweighed by the possible prejudicial effect of the testimony). See also Owens v.
International Bus. & Mercantile Reassurance Co., supra, (where no evidence
existed which suggested that the prior claim was fraudulent, evidence of such prior
claim was properly excluded at trial). See also Smith v. State Farm Fire &
Casualty Co., 633 F.2d 401 (5th Cir. 1980) (affirming that evidence of other fires
was inadmissible as relevancy was highly questionable and greatly prejudicial
since there was an inadequate showing that the prior fires were incendiary in nature
and were similar to the subject fire)............................................................35

Waters v. Genesis Health Ventures, Inc.,
400 F. Supp. 2d 808, 811 (E.D. Pa. 2005), citing Fed. R. Evid. 401 ...............33, 34

Waters v. Genesis Health Ventures, Inc., supra,
400 F. Supp. 2d at 811, citing Goodman v. Pa. Tpk. Comm'n,
293 F.3d 655, 670 (3d Cir. 2002) ............................................................33, 34

Waters v. Genesis, Health Ventures, Inc., supra,
400 F. Supp. 2d 808, 811, citing Fed. R. Evid. 402 ............................................33, 34

Westfield Ins. Co. v. Harris,
134 F.3d 608, 614 (4th Cir. 1998) ............................................................32, 33, 35

Westfield Ins. Co. v. Harris, supra,
134 F.3d 608, 614, citing Fed. R. Evid. 404(b) ........................................33

Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,
505 F. Supp. 1190 (E.D. Pa. 1980) citing Trade Development Bank v. Continental
Insurance Co., 469 F.2d 35, 42 (2d Cir. 1972); McIntyre v. Reynolds Metals Co.,
468 F.2d 1092, 1093 n. 2 (5th Cir. 1972); United States v. Squella-Avendano, 478
F.2d 433, 439 (5th Cir. 1973) 1980) ....................................................28

## COURT RULES

Fed. R. Evid. 801(c) ..............................................................25

Fed. R. Evid. 801(a) ..............................................................25

Federal Rule of Evidence 804 .......................................................27

Pa.R.Civ.P. 4003.5 ................................................................37

## OTHER REFERENCES

Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure:
Evidence §5166, at 74 n.47 (1978) ................................................33

E. Cleary, McCormick on Evidence §196 at 577-80 (3d ed. 1984) ....................34

Fire & Arson Investigator, (April 1999) ..........................................11

Owens v. International Bus. & Mercantile Reassurance Co., 1991 U.S. App. LEXIS
17914 (10th Cir. NM 1991), citing E. Cleary, McCormick on Evidence § 196 at
577-80 (3d ed. 1984) ...........................................................34, 35

## JURISDICTIONAL STATEMEMT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. 1332. This Court has jurisdiction pursuant to Federal Rules of Appellate Procedure Rule 4. The Court entered final judgment in favor of the defendant and against plaintiffs on May 22, 2014 after a jury verdict. Plaintiffs appealed to this Court on June 20, 2014.

## STATEMENT OF ISSUES FOR REVIEW

Plaintiffs seek review of various rulings made by the Trial Court during the trial which plaintiffs contend improperly prejudiced them and tainted the jury's ability to fairly weigh the evidence. These rulings are each set forth in the Legal Argument section of this appeal brief.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This matter has not been brought before this Court previously, and the plaintiffs are unaware of any case or proceeding related to this matter.

## STATEMENT OF THE CASE

This matter arises out of plaintiffs Stephen and Michele McKean's claim for insurance proceeds from their insurance carrier, defendant Nationwide Insurance Company, due to a fire to their home. The lawsuit was brought in the Court of Common Pleas of Pike County, and then removed to the United States District Court for the Middle District of Pennsylvania. The case was tried to jury verdict.

## STATEMENT OF FACTS

This matter arises out of plaintiffs Stephen and Michele McKean's claim to

defendant Nationwide Insurance Company for insurance proceeds pursuant to a

homeowner's insurance policy that plaintiffs purchased from the defendant.  The

Trial Court presented the following overview of the litigation to the jury

immediately prior to opening statements:

> In this case, Plaintiff Stephen and Michele McKean held
> an insurance policy with Nationwide Insurance.  The
> policy provided for payment to Plaintiff's home and
> personal property caused by fire, subject to certain
> exceptions, including when an intentional act of the
> insured, such as arson, is the cause of the fire, or when
> the insured conceals or misrepresents a material fact or
> commits fraud.  Plaintiffs claim that Defendant has
> breached the terms of the insurance policy by refusing to
> pay for the damage sustained to their home and personal
> property following a fire in 2011.
>
> The Defendant asserts that the Plaintiffs' claims are
> barred by the terms and conditions of the insurance
> policy, namely, that the fire at the McKean home was the
> product of arson, and that the McKeans committed
> insurance fraud.[1]

As to the fire, the essential question was whether there were separate fires,

including one on a sofa which, as a result of the flames arising from the fire,

caused a ceiling fan to fall, or whether there was one point of origin of the fire, an

---

[1] P 24-25, 24:24-25:12.

electrical malfunction in the fan, which caused it to fall on the sofa below which caught on fire with the fire then spreading throughout the house.

More specifically, defendant, in denying the claim for insurance coverage, argued that there were two fires in the kitchen, one on papers and one on a rag; and three in the living room, one on a chair and two on couches, with one of those couches being directly under a ceiling fan.[2]  The McKeans contend that the fire started within the fan and was a covered insurance loss.

Trial began on May 19, 2014.  The parties stipulated that the insurance policy between the McKeans and defendant was in effect at the time of the fire, that there was a fire, and that there was an agreed upon monetary amount of damage from the fire; as a result, the McKeans "rested" and defendant began offering its proofs on its affirmative defenses of arson and insurance fraud.[3]  Relevant portions of the testimony are provided below.

### Mark Jackson

Defendant's initial witness was Mark Jackson, a Large Loss Claim Specialist in defendant's Property Damage division.[4]  He is neither a fire investigator nor a cause and origin expert.  Rather, as conceded by defendant's counsel, Mr. Jackson was only responsible for "hiring a special investigator, a cause and origin accident

---

[2] P 249, 49:4-49:9.
[3] P 51, 51:6-51:15.
[4] P 56, 56:10-56:18.

investigator, and…speak[ing] with the Pennsylvania State Police about the origin points."[5]  Despite this, the Court, over objection, allowed Mr. Jackson to opine that the fire had "multiple points of origin."[6]

Mr. Jackson was also responsible for ensuring payment for temporary housing for the McKeans after the fire.[7]  Mr. McKean provided Mr. Jackson with a written temporary housing arrangement[8] signed by both Mr. McKean as tenant, and Richard Black as landlord.[9]

Mr. Jackson testified that he wanted to question Mr. Black but Mr. McKean later advised that the proposed Lease was terminated by Mr. Black who did not wish to become involved with the insurance company, though defendant never explained why it would insist on interviewing Mr. Black simply for entering into a potential lease agreement with Mr. McKean.[10]  Mr. Jackson was permitted to testify, over objection, that someone other than he spoke with Mr. Black and that Mr. Black and his wife Nancy "knew nothing of this document. [the Lease]"[11] Then, after objections to several improper questions by defendant's counsel were sustained, the Court permitted Mr. Jackson to testify, over objection, that he never

---

[5] P 67, 67:14-67:23.
[6] P 71-72, 71:20-72:11.
[7] P 77, 77:4-77:11.
[8] P 81, 81:1-81:22.
[9] P 81-82, 81:23-82:1.
[10] P 82, 82:2-82:10.
[11] P 82, 82:14-82:25.

located Mr. Black, though he conceded that he never attempted to find Mr. Black.[12]

An additional improper situation arose during cross-examination when Mr. Jackson conceded that he took handwritten notes of his investigation, including an interview of Mr. McKean.[13] These notes were made part of a claim file.[14] Despite requests from the defendant for these notes, defendant did not provide the full notes to the McKeans.[15] As a result, the McKeans moved to strike the entire testimony of Mr. Jackson; that request was denied.[16]

Mr. Jackson was also asked during cross-examination about a letter he wrote to the McKeans which states that "[t]he investigation revealed that there are five unrelated points of origin in the home and that the fire was intentionally set."[17] In light of his writing, he was asked to agree that if the fire had originated from one point of origin as opposed to the five points that defendant claimed, there would be no basis to deny the claim.[18] The Court would not permit Mr. Jackson to answer that question because it "require[s] some expertise on this witness' part."[19]

### Russell Andress

---

[12] P 86-87, 86:21-87:5.
[13] P 94-98, generally, 94:16-98:15.
[14] Id.
[15] Id. Defendant's counsel represented that the notes in question are bate stamped McKean 3920 to 3945 but plaintiffs were never provided these documents.
[16] Id.
[17] P 102, 102:5-102:8; see also the defendant's April 17, 2012 letter, attached as P 598-601, and introduced at trial as Plaintiffs' Exhibit 6.
[18] P 102-103, 102:11-103:6.
[19] P 103, 103:7-103:9.

Defendant then called Russell Andress as a witness. Trooper Andress is employed by the Pennsylvania State Police and assigned to the Fire Marshal section of the Criminal Investigation Unit.[20] The Court admitted him as an expert in fire investigations and determinations.[21] Essentially, Trooper Andress opined that there were "five different fire origins in this home, each of those fires were incendiary in nature or started with an open flame or a case of arson."[22]

In the days following the Trooper's decision to rule the cause of the fire as arson, he investigated Mr. McKean's proffer that he was at various places, such as Wal-Mart, Dunkin Donuts, and Rite Aid on the afternoon of the fire which, in essence, demonstrated that he was not at home setting the fire, as alleged by defendant.[23] Trooper Andress testified, for example, that he reviewed the Wal-Mart video and that Mr. McKean was not on the tape.[24]

In addition, Trooper Andress reviewed Mr. McKean's cell phone records from the night of the fire.[25] He testified that one phone call, approximately fifteen minutes prior to the 911 call Mr. McKean made advising the fire department of the fire, was to a "contractor," with whom the Trooper contacted.[26] Defendant's

---

[20] P 106, 106:10-106:14.
[21] P 112, 112:10-112:11.
[22] P 130, 130:4-130:12.
[23] P 135, 135:16-135:21.
[24] P 135-136, 135:22-136:2.
[25] P 138, 138:20-138:24.
[26] P 139-140, 139:21-140:17.

counsel asked him, "What, if anything, did you learn as a result of your investigation about the contents of that phone call?"[27]

The McKeans' counsel immediately objected, as the question was clearly asked to elicit hearsay testimony.[28] The Judge sustained the objection, and defendant's counsel then, at sidebar,[29] argued that the contractor:

> is outside of the subpoena power of the Court and is therefore unavailable under 804. Under Rule 804, if he is unavailable, there are certain steps you can take with respect to his statements and business records, statements affecting business and property. I believe that this statement falls under one of the exceptions in 804 where the witness is unavailable.[30]

Though, the McKeans' counsel responded that the proffer is based on an incorrect understanding of the applicable rule, and that the proposed testimony is hearsay and not permissible, the Court, without any explanation, overruled the objection.[31]

Trooper Andress testified that the contractor "contacted Mr. McKean on the cell phone, he answered, seemed upset something about a fire, and said, 'You'll have to talk to my wife', and he handed the phone to Mrs. McKean."[32]

During cross-examination Trooper Andress conceded that he arrived at the home around 10:30 p.m., when it was dark, after the fire was extinguished, and

---

[27] P 140, 140:18-140:19.
[28] P 140, 140:20-140:21.
[29] P 140, 140:22-140:24.
[30] P 141, 141:2-141:8.
[31] P 141-142, 141:10-141:13; 142:3.
[32] P 142, 142:5-142:15.

after the electricity to the house was turned off.[33]  Within less than forty minutes, in the middle of the night with less than full light, he concluded that the fire was of incendiary origin with five separate starting points.[34]

Trooper Andress conceded that while he testified that there were two fires in the kitchen and three in the living room of the McKeans' home, for fire investigation purposes, all of the fires are considered to be in one compartment.[35] He also was unable to state with any specificity when the fires started, the order of the fire, or the time frame of the fire.[36]

During cross-examination, the McKeans' counsel played a portion of the Wal-Mart video.  At the time that Mr. McKean said he was there, the video shows Mr. McKean at Wal-Mart.[37] Trooper Andress also conceded that Mr. McKean was at Dunkin Donuts and Rite Aid at the time the fire could have originated, as Mr. McKean stated during the investigation.[38]

### 911 Call

Defendant next sought to introduce as evidence the entire audio recording of the 911 call made by Mr. McKean upon his discovery of the fire.  In the call, Mr. McKean stated, "My house is on fire again."  Though the Court ruled previously

---

[33] P 152, 152:2-152:12.
[34] P 152-153, 152:22-152:23; 153:20-153:23.
[35] P 177, 177:15-177:22.
[36] P 178-179, 178:22-179:13.
[37] P 183-184, 183:3-184:6.
[38] P 184, 184:7-184:11.

that any evidence of prior fires suffered by the McKeans are excluded from introduction at trial, defendant sought to introduce this irrelevant but prejudicial statement.[39]   The McKeans objected to playing the call and instead offered to either stipulate to the time of the 911 call or suggested that defendant read any other statements made in the 911 call to the jury.[40]   The Court permitted the tape to be played in its entirety to the jury, finding that the statement "is an admission of party under 801" and based upon defendant's representation that it would not cross-examine Mr. McKean about any prior fire.[41]

### **Thomas Jones**

Defendant called fire and arson investigator Thomas Jones as an expert witness.[42]   In 32 years of fire investigation, Mr. Jones worked for an insured once.[43]   He testified that in his opinion the "fire was arson and incendiary in nature. There are five distinct and separate points of origin, and there is no communication between the five points of origin that were found."[44]

Mr. Jones authored three reports and never mentioned a burnt rag and what effect, if any, it had on his investigation.[45]   However, at trial, defendant sought to

---

[39] P 203, 3:5-3:17.

[40] P 203-204, 3:20-4:10.

[41] P 204-206, 4:22-6:13.

[42] P 211, 11:13-11:19.

[43] P 239-240, 39:1-39:6; 40:11-40:13.

[44] P 213, 13:9-13:17.

[45] Mr. Jones' reports were marked as Defendant Exhibits 14.2, 14.3, and 14.4,

introduce testimony from Mr. Jones about the rag.[46]  The McKeans objected as this

testimony is clearly outside the report and prejudiced the McKeans from preparing

for Mr. Jones' testimony.[47]  The Trial Court overruled the objection and allowed

Mr. Jones to testify to the jury about a claimed origin of a fire that he never

mentioned in his reports.[48]

     During cross-examination, the McKeans attempted to highlight, by way of

an article written by an association of which Mr. Jones is a member, that an

investigation by Mr. Jones was tainted when he improperly opined that there were

multiple points of origin at a fire scene, which is the exact issue in this case.  Upon

objection by defendant, the Court refused to permit this inquiry.[49]  The Court then

instructed the jury that the article cited by the McKeans "do not support the

question [asked of Mr. Jones during cross-examination] and they do not warrant an

answer…So that question was inappropriate.  It wasn't supported by those

documents, those documents will not come into evidence, and you are to put them

out of your mind, as well as any potential answer you anticipated Mr. Jones giving.

The question was inappropriate."[50]

---

attached as P 602-635.
[46] P 222-223, 22:19-23:5.
[47] P2, 23:15-23:23.
[48] P 223-224, 23:23-24:1.
[49] P 271-275, 71:18-75:6.
[50] P 276, 76:3-76:12

The article in question, titled "A Calculated Arson," is from the April 1999 edition of Fire & Arson Investigator.[51]  The article concerned a fire investigation in which Trooper Jones was the lead investigator which ultimately led to a conviction of Han Tak Lee for arson.   One of the "key words" listed in the article is "junk science."  The author writes:

> The purpose of this article is to acquaint readers with some of the methods *still* used by some fire investigators to obtain convictions.  These methods pretend to be founded in science, but are in fact founded only in mythology and pseudo-science.  This fire investigation and subsequent trial demonstrate that a practiced expert witness with a straight face and a file full of "quantitative" data is capable of convincing an untrained jury and judge of just about anything.[52]

The article examined the facts of the <u>Lee</u> matter as well as the trial testimony provided by Trooper Jones and others.  Similar to the McKeans' matter, Trooper Jones improperly found there were multiple points of origin which, as a result, caused him to classify the fire as arson. The author refuted each of Trooper Jones' opinions, and concluded the article by writing, "Much has been written lately about the criminal justice system allowing guilty people to escape justice due to sloppy police work.  Here is the case of the wrongful conviction of an innocent man,

---

[51] P 636-641, Fire & Arson Investigator, April 1999, introduced at trial as Defendant's Exhibit 85.

[52] <u>Id.</u>

surely a worse result. The Lee case represents the ultimate triumph of junk science."[53]

Less than a month after the McKean trial ended, United States Magistrate Judge Martin Carslon of the Middle District of Pennsylvania recommended that Mr. Lee's conviction be overturned due to the junk science engaged by Mr. Jones, which is the exact same junk science that the McKeans were not permitted to explore. That recommendation was accepted by United States District Judge William Nealon, Jr., who ultimately provided Mr. Lee the ability to obtain bail after being in prison for approximately 25 years.[54]

### Joseph DeFazio

Joseph DeFazio is a full-time Special Investigator for the defendant.[55] In the course of the direct examination, defendant's counsel sought to extract testimony from Mr. DeFazio about his conversations with the potential lessor, Mr. Black, but the Judge sustained the McKeans' objection, stating, "Mr. DeFazio, I've made a ruling that while you're able to state the results of your investigation, that you are not permitted to tell this jury what persons said to you."[56]

---

[53] Id.
[54] A copy of the opinions is attached as P 642-660.
[55] P 281-282, 81:10-82:15.
[56] P 292, 92:8-92:19.

### Sidney Rubin

Defendant then called Sidney Rubin, its electrical engineering expert, to the witness stand.[57] Mr. Rubin opined that the fan was neither the cause nor a contributor to the fire.[58]

### Rule 50 Motion

Defendant then rested. The McKeans made a Rule 50 Motion stating:

> Defendant has not proved to a sufficient length that they have proved their affirmative defense that this was a fire of incendiary origin.
>
> The only evidence, thus far, is that there are five fires in one room, and their testimony, apparently, is there's no way these fires could be connected. Under NFPA 921, there is a provision, specifically, about multiple fires on different floors or different rooms where there are compartments or inside and outside.
>
> These were all five fires in one room. So for those reasons, we would move, under Rule 50, to have the affirmative defenses stricken.[59]

The Court denied the Motion.[60]

The McKeans then began introducing rebuttal evidence to the affirmative defenses that the fire was incendiary and that they committed insurance fraud.

---

[57] P 306, 308, 106:17-106:2; 108:17-108:190.
[58] P 317, 117:19-117:25.
[59] P 328-329, 128:25-129:12.
[60] P 330, 130:8-130:10.

## Michele McKean

Michele McKean, the McKeans' first witness, testified that she lived in her home , 803 Raymondskill Road in Milford, Pennsylvania, with her husband Steve from the time they were married approximately nine years ago to the present day.[61] Her house was "just beautiful," with amenities including five bedrooms, two Jacuzzis, and two steam rooms.[62]

On the day of the fire, Mrs. McKean followed her normal morning ritual, which included waking up with her husband, who left for work shortly after, taking her two dogs out for a walk and then putting them in a crate in her home, before leaving for work around 10:00 a.m.[63]

She made the half hour commute to work at a bar named Fireman Dan's in Sussex, New Jersey.[64] She was scheduled to be there from around 10:30 a.m. until after 6:00 p.m.[65] She and Mr. McKean spoke and texted throughout the day.[66] They decided that he was going to pick up sausage and peppers for their dinner which she would prepare when she arrived back home. [67]

---

[61] P 331-332, 131:18-131:19; 132:1-132:17.
[62] P 332-333, 132:20-133:1.
[63] P 333-334, 133:23-134:20.
[64] P 333, 133:11-133:22.
[65] P 334-335, 134:24-135:6.
[66] P 335, 135:7-135:14.
[67] P 335, 135:15-135:19.

Her work shift was extended so their dinner plans changed.[68]  Instead of eating at home, she suggested they meet at Joey's Pizzeria, a restaurant close to their home.[69]  Mr. McKean agreed and mentioned that because it was starting to rain, he was going to stop at their home first so he could bring in the dogs, who he had earlier taken outside.[70]

Mrs. McKean left the bar and went to the restaurant, arriving before Mr. McKean.[71]  She waited a few minutes, and then, around 7:00 p.m., called him on his cell phone.[72]  He answered the phone, out of breath, and said that their house was on fire.[73]  In her words, she "freaked out, literally.  I started crying, and I got into my car, and I made it home, probably in record time."[74]  Upon arriving home, she saw her husband "holding his chest in the driveway, he was all full of soot, black, and he was hysterical."[75]  The fire department arrived shortly after she did.[76]

---

[68] P 335, 135:20-135:24.
[69] P 336, 136:9-136:19.
[70] P 336, 136:20-136:25.
[71] P 337, 137:1-137:6.
[72] P 337, 137:13-137:20.
[73] P 337, 137:21-137:23.
[74] P 337-338, 137:24-138:1.
[75] P 338, 138:2-138:4.
[76] P 338, 138:5-138:8.

In contrast to Trooper Andress' testimony, Mrs. McKean testified that she did not speak with anyone on her husband's cell phone that night nor did she know Thomas Graves, the contractor who allegedly spoke with Mr. McKean.[77]

### Stephen McKean

Mr. McKean next testified. He stated that he bought his house in 1986.[78] It is his "dream house," a 6,000 square foot house with five bedrooms, five bathrooms, a 36 foot octagon living room, with a pond and the Raymondskill Brook running through his backyard.[79] Mr. McKean spent a significant amount of time describing the property and the house, as well as the intricate carvings that were within his home, all of which were destroyed by the fire.[80]

He told the jury that he is presently, and has been for 40 years, a custom home builder, in business with his brother.[81] His office is three and a half miles from his house.[82] Over the past several years business has been steady but "instead of you making a dollar, you're making about 70 cents for the work that you used to

---

[77] P 338, 138:9-138:13.
[78] P 346, 146:18-146:19.
[79] P 346-347, 146:24-147:12.
[80] P 352, 152:8-152:14.
[81] P 357, 157:9-157:16.
[82] P 362, 162:7-162:9.

do."[83]  In light of the properties and mortgages he holds, Mr. McKean's financial situation has been fairly constant from 2010 to the present.[84]

He testified to a couple of relevant events prior to the fire.  A couple of days before the fire, the McKeans made a significant purchase, buying a new dishwasher.[85]  Mr. McKean also testified that there was a power surge in the house which resulted in a cessation of electricity.[86]

On the day of the fire, Mr. McKean, as is his custom, woke up between 6 and 6:30 a.m., took his dogs out for a walk, and left for work around 7:30 a.m.[87]  Around lunchtime, Mr. McKean went home, took the dogs out of the cage and brought them outside.[88]  The ceiling fan that he put on in the morning was still on when he left the house after taking the dogs outside.[89]

As it was a beautiful day, Mr. McKean kept the dogs outside in the backyard, tying them to two separate posts, and left food for them; the dogs were each on a four foot leash so they had the option of staying in the shade or on a concrete patio which was under the sun.[90]

---

[83] P 359, 159:10-159:17.
[84] P 360, 160:6-160:10.
[85] P 363, 163:21-163:25.
[86] P 364, 164:1-164:5.
[87] P 365, 165:7-165:14.
[88] P 366, 166:17-166:23.
[89] P 366, 166:24-166:25.
[90] P 367-368, 167:19-168:4.

He went back to work and, after having the conversation with his wife to which she had previously testified, completed some errands.[91]  One of the errands was to Wal-Mart, a stop which the defendant adamantly contended was fabricated. However, Mr. McKean (and before him Trooper Andress on cross-examination) positively identified himself on the video surveillance shown to the jury, entering the store at 5:06 p.m. and leaving at 5:23 p.m.[92]  He went back to work and then, after he and his wife agreed to change their dinner plans, went home to put the dogs into the house before meeting her for dinner.[93]

He arrived home a bit after 7:00 p.m.[94]  When he arrived home, he heard the house alarm.[95]  He opened the front door, was blown back from the heat of the fire, and was instantly covered in soot, unable to see even seven feet into the house.[96]  He ran from the front of the house to the garage, and called 911 as he was entering the code to open the garage door.[97]

Upon opening the garage door, Mr. McKean went into the garage and opened the door leading to the kitchen; he could not see anything due to the smoke,

---

[91] P 368-369, 168:18-169:6.
[92] P 369-370, 169:7-170:16.
[93] P 372, 172:15-172:23.
[94] P 373, 173:1-173:2.
[95] P 373, 173:4-173:7.
[96] P 373-374, 173:8-173:1; 174:15-174:19.
[97] P2 373 173:17-173:19.

and went around the outside to where the dogs were located.[98]  He moved them to a dog run set further away from the house.[99]

Mr. McKean then ran around the outside of the house and saw through the windows flames in the living room.[100]  He tried to smash the door and windows with "big round concrete patio stones" but could not break through.[101]  The Fire Chief then arrived.[102]  Due to the stress, Mr. McKean fainted and was taken by ambulance to the hospital.[103]

### Daryl Ebersole

The McKeans next produced Daryl Ebersole, who is both an electrician and an electrical engineer, a Certified Fire Investigator, and a Certified Fire and Explosion Investigator.[104]  At all relevant times, he was the Director of the Fire Practice at his employer, Robson Forensic.[105]  He has participated in the investigation of over 1,000 fires, "frequently" investigating electrical fires.[106]  Mr.

---

[98] P 374, 174:23-174:25.
[99] P 375, 175:3-175:6.
[100] P 375, 175:7-175:19.
[101] P 375-376, 175:21-176:2.
[102] P 376, 176:3.
[103] P 376-377, 176:17-177:3.
[104] P 412-413, 3:13-3:18; 4:6-4:8.
[105] P 412, 3:21-3:23.
[106] P 414, 5:6-5:20.

Ebersole has been qualified as an expert in over 20 trials, and was admitted here as an expert in the field of Electrical Engineering and Fire Science.[107]

Mr. Ebersole examined the McKeans' living room ceiling fan, which included microscopic examination and electrical testing, and reviewed deposition testimony, reports, and photographs of the fire scene.[108]

Mr. Ebersole was the one who actually took apart the ceiling fan and examined it after the fire.[109]  Hs examination revealed "evidence of higher melting, more melting at the portions of the windings where they flow through the laminates," which indicates "higher heat from within the motor."[110]  This information led Mr. Ebersole to conclude that "the appliance caus[ed] the high heat that would cause a fire, as opposed to being attacked by the fire."[111]  In other words, the ceiling fan caused the fire as opposed to there being fire on the couch which caused the ceiling fan to catch fire.

He testified that if the fan fell and landed on the couch below it, the sofa would begin to burn and release an extremely high amount of heat, which would, in turn, cause the gases in the room to vent upward.[112]  As a result, the couch and

---

[107] P 415, 6:3-6:14.
[108] P 415-416, 6:16-7:3.
[109] P 424-425, 15:24-16:2.
[110] P 431, 22:13-22:21.
[111] P 432, 23:2-23:7.
[112] P 437, 28:4-28:13.

chair near the sofa could then be ignited[113]; thus, the three origin sources in the living room, as determined by defendant, are actually one origin, the ceiling fan.

Mr. Ebersole next discussed "flying brands," which are "materials that catch on fire and become mobile, and they are, basically, flying, burning pieces that will carry fire to locations sometimes away from where the fire ignites."[114] As to why these brands "fly," Mr. Ebersole explained that "when you have the heat of a fire, and certainly when you have a sofa, you have a lot of energy, and that burns with very high release rates of energy…air when it is heated rises, and this can become a violent force in a raging fire, so that that will cause these flying brands to become mobile."[115]

Flying brands were in the McKean home during the fire.[116] Mr. Ebersole showed the jury numerous pictures of flying brands in the McKean home, including in the areas in the kitchen that defendant insisted are separate origins.[117]

Mr. Ebersole classified the fire as "undetermined" due to the inability to determine exactly which part of the fan caused the fire. As he testified, "With the fan having the evidence of arcing, the melted lamp holders, the burned materials that were part of the lamp and the fan structure, the evidence of the windings in the

---

[113] P 437, 28:14-28:20.
[114] P 418, 9:13-9:17.
[115] P 418, 9:18-9:24.
[116] P 418-419, 9:25-10:1.
[117] P 438-445, 29:8-36:2.

localized high heating in the windings, themselves, I could not determine which factor or which of those in the fan were the cause, but certainly it wasn't[118] the fan that caused the fire."[119]  He further testified within a reasonable degree of professional certainty that there is no evidence that the fire at the McKeans' house was of incendiary origin.[120]

### Joseph Myers

Joseph Myers, the next witness produced by the McKeans, was a career fire fighter for the City of Middleton, retiring in 1985 as a Lieutenant.[121]  He has fought around 6,000 fires.[122]  Shortly after retirement, he became a member of the Orange County Arson Task Force, which was formed to assist the local fire chief in determining the cause and origin of fires, and became a certified Explosion and Fire Investigator by NAFI as well as a Certified Fire Instructor.[123]  Lieutenant Myers has investigated between 3,500 and 4,000 fires.[124]  He was admitted in this matter as an expert in fire investigation and fire-fighting.[125]

---

[118] The word "wasn't" is a transcription error, as the tenor of the testimony and defendant's objection immediately afterward suggests.  Mr. Ebersole said the word "was."

[119] P 445, 36:14-36:22.

[120] P 446, 37:12-37:25.

[121] P 488, 79:4-79:12.

[122] P 488, 79:20-79:23.

[123] P 489-490, 80:11-80:18; 81:14-81:19.

[124] P 491, 82:15-82:17.

[125] P 493, 84:11-84:12.

Lieutenant Myers explained to the jury both verbally and through pictures that the fires in the living room were in effect one fire, as opposed to separate, distinct fires with no connection between them.[126] He also advised the jury that flying brands could be the basis for the burn patterns in the kitchen that the defendant mistakenly thought were separate points of origin.[127] He further testified, within a reasonable degree of scientific certainty, that the fire at the McKeans home was not a fire of incendiary origin.[128]

During defendant's cross-examination of Lieutenant Myers, counsel asked him "It is important that crime scenes be preserved?"[129] The McKeans immediately objected, and defendant's counsel then offered to withdraw the question because it is clearly prejudicial to discuss a "crime scene" in a civil case for insurance proceeds.[130] Withdrawing the question did not cure the prejudice, but rather than address that, the Court stated, "As far as I'm concerned, the question was appropriate,"[131] thus clearly suggesting to the jury that the Court felt that this was a crime scene and by extension that the McKeans engaged in arson.

---

[126] P 505-506, 96:13-97:2.
[127] P 507, 98:6-98:19.
[128] P 508, 99:11-99:23.
[129] P 514, 105:8.
[130] P 514, 105:9-105:10.
[131] P 514, 105:12-105:13.

The parties the presented their closing arguments, with defendant spending an overwhelming amount of time discussing the hearsay evidence regarding the proposed lease.[132]

The jury was asked two questions on the verdict sheet:

> Question 1.  Did Defendant Nationwide Insurance Company prove by a preponderance of the evidence that the damage to Stephen and Michele McKean's home and property resulted from an intentional act, such as arson, committed by or at the direction of one or both of the Plaintiffs, and that the loss may reasonably have been expected to result from such act or that the loss was the intended result from such act?

> Question 2.  Do you find by clear and convincing evidence that Plaintiffs Stephen and Michele McKean committed insurance fraud relative to the fire and/or the investigation of the fire?[133]

The Jury answered "Yes" to both questions.[134]  This appeal followed.

## SUMMARY OF ARGUMENT

Plaintiffs bring this appeal contending that the Trial Court made numerous improper evidentiary rulings, including allowing hearsay statements into evidence; restricting plaintiffs from fully cross-examining defendant's expert; and making inappropriate remarks about the plaintiffs' claims, all of which combined to taint

---

[132] See P 548-567, 139:13-158:4.
[133] P 594-595, 2:23-3;9.
[134] P 595, 3:5; 3:7.

the jury's verdict.  Plaintiffs ask this Court to vacate the jury's decision and

remand this matter back to the Trial Court for a new trial.

## LEGAL ARGUMENT

### A. MANY EVIDENTIARY RULINGS MADE BY THE TRIAL COURT WERE IN ERROR WHICH PREJUDICED THE JURY FROM FAIRLY ANSWERING THE JURY INTERROGATORIES

The Trial Court permitted significant hearsay and other improper evidence

which prejudiced the McKeans and deprived them from receiving a fair trial.  As a

result of the Court's rulings, the jury was unable to fairly weigh the evidence of the

case.  As a result of these errors, this matter should be remanded for a new trial.

"'Hearsay' is a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted." [135] A "statement" can be either a written or oral assertion or any

nonverbal conduct intended as an assertion.[136]  Federal Rule of Evidence 802 states

that "hearsay is not admissible unless any of the following provides otherwise: a

federal statute; these rules; or other rules prescribed by the Supreme Court."

"Whether a statement is hearsay is a legal question subject to plenary

review."[137]  "If the district court correctly classifies a statement as hearsay, its

---

[135] Fed. R. Evid. 801(c); United States v. Reynolds, 715 F.2d 99, 101 (3d Cir. 1983).
[136] Fed. R. Evid. 801(a).
[137] United States v. Price, 458 F.3d 202, 205 (3d Cir. 2006).

application of the relevant hearsay exceptions is subject to review for abuse of discretion."[138]

In the present case, the Trial Court erred in allowing Mr. Jackson's hearsay testimony about the Lease into evidence. First, Mr. Jackson was permitted to testify at trial, over objection, that someone other than he spoke with Mr. Black and that Mr. Black and his wife knew nothing about a lease agreement signed by Mr. McKean and Mr. Black.[139] This testimony was clearly presented to prove the truth of the matter asserted but was an out of court statement by someone other than Mr. Jackson. To that end, the testimony was classic hearsay and should have been barred pursuant to FRE 801 and 802. By allowing the testimony, the jury was led to believe that Mr. McKean was lying about the Lease and intending to defraud the defendant, without any means for the McKeans to defend themselves. Neither Mr. nor Mrs. Black had ever been deposed, or listed as a witness, nor was there even a written statement attributed to them. The trial testimony regarding the Blacks related directly to the question of insurance fraud and generally was designed to impugn the credibility of Mr. McKean.

The Court also improperly permitted Trooper Andress to testify regarding conversations with non-parties. Specifically, the Court permitted Trooper Andress

---

[138] Id.
[139] P 82, 82:14-82:25.

to recall an alleged conversation he had with a potential client of Mr. McKeans though that person was never deposed, listed as a witness, or subpoenaed.

To that end, Federal Rule of Evidence 804 states in relevant part:

(a) Criteria for Being Unavailable.  A declarant is considered to be unavailable as a witness if the declarant:

(1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies;

(2) refuses to testify about the subject matter despite a court order to do so;

(3) testifies to not remembering the subject matter;

(4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or

(5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:

    a. the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or

    b. the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).

But this subdivision (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying.[140]

Rule 804(a)(5) provides that a declarant of former testimony is unavailable if the proponent "has been unable to procure his attendance... by process or other

---

[140] Federal Rule of Evidence 804.

reasonable means." In civil cases, it has long been the rule that inability to procure attendance by "process or other reasonable means" is satisfied by demonstration of inability to serve a subpoena.[141] .

In the present case, defendant made absolutely no showing that the contractor was "outside the subpoena power of the Court." Nor did the Court inquire why the witness was outside the subpoena power of the Court if that was in fact the situation. Without any explanation whatsoever, the Trial Court permitted Trooper Andress to testify that the contractor "contacted Mr. McKean on the cell phone, he answered, seemed upset something about a fire, and said 'You'll have to talk to my wife', and he handed the phone to Mrs. McKean."

Such testimony should never have been allowed and the jury should have never been able to hear the testimony regarding any alleged conversations between the contractor and the McKeans. This testimony was damaging for a few reasons. First, it placed Mrs. McKean at the home twenty minutes before she became aware of the fire, thus suggesting that she participated in setting the fire. Second, it suggested that Mr. McKean was aware of the fire twenty minutes before he called 911 to report the fire, suggesting that he set the fire. By allowing this testimony

---

[141] Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F. Supp. 1190 (E.D. Pa. 1980) citing Trade Development Bank v. Continental Insurance Co., 469 F.2d 35, 42 (2d Cir. 1972); McIntyre v. Reynolds Metals Co., 468 F.2d 1092, 1093 n. 2 (5th Cir. 1972); United States v. Squella-Avendano, 478 F.2d 433, 439 (5th Cir. 1973).

the Trial Court put the McKeans in an impossible situation, forcing them to prove a negative. That is an unfair burden and one not permissible under our court rules.

By contrast, the Trial Court prohibited the same testimony about the lease later in the trial. In the course of the direct examination, defendant's counsel sought to again extract testimony regarding the Lease. This time, however, the Judge sustained the McKeans' objection, stating, "Mr. DeFazio, I've made a ruling that while you're able to state the results of your investigation, that you are not permitted to tell this jury what persons said to you."[142] That was the right call then and should have been made with the other witnesses.

## B. THE TRIAL COURT SHOULD HAVE DISQUALIFIED THE ENTIRETY OF MR. JACKSON'S TESTIMONY DUE TO THE DEFENDANT'S FAILURE TO PROVIDE THE ENTIRE CLAIM FILE, INCLUDING MR. JACKSON'S INTERVIEW WITH PLAINTIFF STEPHEN MCKEAN

Rule 37 of the Federal Rules of Civil Procedure governs sanctions against a party who fails to provide discovery as required by the discovery rules or a court order. The Court must analyze whether the defalcation is by the party, the attorney, or both. Rule 37 sanctions are available to the district court "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."[143] The

---

[142] P 292, 92:8-92:19.
[143] Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976).

Court has broad discretion regarding the type and degree of sanctions it can impose,[144] but the sanctions must be just and related to the claims at issue.[145] Rule 37(b)(2) specifically provides for several sanctions, including discretion to deem facts as established, bar evidence, strike or dismiss pleadings, enter a default judgment, and find a party in contempt.

In deciding whether to exclude evidence as a sanction for failing to comply with an Order compelling discovery, the Court must consider: (1) the prejudice or surprise to the party against whom the withheld evidence will be offered; (2) the ability to cure the prejudice; (3) the extent to which the evidence would disrupt the orderly and efficient trial of the case; and (4) bad faith or willfulness of the delinquent party in failing to comply with the court's orders.[146] Prejudice need not be irremediable and may include the "burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy" and the burden a party

---

[144] See Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 110 F.R.D. 363, 367 (D. Del. 1986) (citing Nat'l Hockey League, 427 U.S. at 642).

[145] Estate of Spear v. Comm'r of Internal Revenue Serv., 41 F.3d 103, 109 (3d Cir. 1994) (citing Ins. Corp. of Ireland v. Compagnie Des Bauxites, 456 U.S. 694, 707, 102 S. Ct. 2099, 72 L. Ed. 2d 492 (1982)).

[146] In re Mercedes-Benz, 225 F.R.D. 498, 506; Wachtel, 2006 U.S. Dist. LEXIS 88563, 2006 WL 3538935, at *20 (citing Meyers, 559 F.2d at 904). See also Quinn v. Consolidated Freightways Corp. of Delaware, 283 F.3d 572, 577 (3d Cir. 2002).

must bear when forced to file motions in response to the strategic discovery tactics of an adversary.[147]

Here, defendant's failure to produce relevant discovery was not the result of neglect, negligence or inadvertence. Defendant made a conscious and deliberate choice to ignore its discovery obligations and produce complete information regarding the investigation of the loss- including any and all statements made by the McKeans. Defendant provided some, but not all, of the claims file. Then, defendant referenced the material at trial, e.g., a conversation that Mr. Jackson had with Mr. McKean[148], which it specifically excluded in the discovery process.[149]

Since there is no doubt that the requested discovery is unquestionably relevant, there was no other reasonable means for the McKeans to obtain the requested information, and without the information the McKeans were substantially prejudiced, it was appropriate to strike Mr. Jackson's testimony in full. That was all the Court could do to minimize the prejudice suffered by the McKeans at trial.

---

[147] Ware v. Rodale Press, Inc., 322 F.3d 218, 222 (3d Cir. 2003). See also Adams v. Trustees of the New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863, 874 (3d Cir. 1994) (finding prejudice from the withholding of relevant information through non-cooperation in the discovery and costs incurred to obtain court orders to obtain compliance); Wachtel, 2006 U.S. Dist. LEXIS 88563, 2006 WL 3538935, at *21; Wortman v. Brown, No. 05-1411, 2006 U.S. Dist. LEXIS 21222, 2006 WL 1044787, at *3 (D.N.J. 2006).

[148] P 94-98, generally, 94:16-98:15.

[149] Defendant's counsel represented that the notes in question are bate stamped McKean 3920 to 3945 but plaintiffs were never provided these documents

Under the circumstances of this case, the Trial Court erred in precluding the testimony of defendant's witness and from offering evidence at trial to support its Affirmative Defenses about which it refused to produce discoverable information.

### C. THE TRIAL COURT ERRED IN ALLOWING THE ENTIRE 911 CALL TO BE HEARD BY THE JURY BECAUSE IT HAD RULED THAT EVIDENCE OF FIRES AT OTHER PROPERTIES OWNED BY PLAINTIFFS WAS IRRELEVANT AND PREJUDICIAL.

The Trial Court erred in allowing the entire audio recording of the 911 call made by Mr. McKean. Prior to the trial commencing, the Court ruled that any evidence of prior fires at the McKean property would be excluded. However, in the 911 recording, Mr. McKean stated, "My house is on fire again." Allowing that recording to be heard by the jury is reversible error.

Federal Rule of Evidence 404(b) provides that prior-acts evidence, when relevant, is admissible unless it is offered to prove "the character of a person in order to show action in conformity therewith."[150] Thus, prior act evidence is inadmissible for the purpose of proving that plaintiff is litigious[151] or is accident prone and therefore more likely to have been at fault.[152] The Rule includes a list of those purposes for which prior-acts evidence may be admitted: "motive,

---

[150] See <u>Westfield Ins. Co. v. Harris</u>, 134 F.3d 608, 614 (4th Cir. 1998).
[151] See <u>Outley v. Goetz</u>, 837 F.2d 587, 592 (2nd Cir. 1988).
[152] See <u>Monger v. Cessna Aircraft Co.</u>, 812 F.2d 402, 406 (8th Cir. 1987).

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[153]

To be relevant, the evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[154] Because FRE 401 makes evidence relevant "if it has any tendency to prove a consequential fact, it follows that evidence is irrelevant only when it has no tendency to prove the fact."[155] Evidence which is not relevant is not admissible."[156]

All relevant evidence, however, whether offered under FRE 402 or 404(b), is subject to exclusion under FRE 403 when its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[157] The Third Circuit has stated: "the . . . prejudice against which the law guards [is] . . . unfair prejudice- . . . prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which

---

[153] See Westfield Ins. Co. v. Harris, supra, 134 F.3d 608, 614, citing Fed. R. Evid. 404(b).

[154] See Waters v. Genesis Health Ventures, Inc., 400 F. Supp. 2d 808, 811 (E.D. Pa. 2005), citing Fed. R. Evid. 401.

[155] Id., citing Blancha v. Raymark Indus., 972 F.2d 507, 514 (3d Cir. 1992) (quoting 22 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5166, at 74 n.47 (1978)).

[156] See Waters v. Genesis Health Ventures, Inc., supra, 400 F. Supp. 2d at 811, citing Fed. R. Evid. 402.

[157] See Westfield Ins. Co. v. Harris, supra, 134 F.3d at 614.

inhibits neutral application of principles of law to the facts as found."[158] Courts have consistently ruled that "evidence of prior insurance claims frequently is more prejudicial than probative."[159]

Thus, to be admissible, evidence of other acts must be (1) relevant to an issue other than character, and (2) the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of FRE 403.[160]

In addition, "the two acts must be significantly similar with respect to the issue to which the evidence of the extrinsic act is addressed, and there must be evidence showing that the extrinsic act in fact occurred and the person accused of committing the act in fact did so."[161] Thus, even if the other acts are founds to be relevant, "substantial doubt as to its similarity…will necessarily dilute its probative value for proposes of the balancing required."[162]

Thus, some federal courts have set forth a four prong test for the admissibility of evidence under Rules 404(b) and 403:

---

[158] See Waters v. Genesis Health Ventures, Inc., supra, 400 F. Supp. 2d at 811, citing Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 670 (3d Cir. 2002).
[159] See Owens v. International Bus. & Mercantile Reassurance Co., 1991 U.S. App. LEXIS 17914 (10th Cir. NM 1991), citing E. Cleary, McCormick on Evidence § 196 at 577-80 (3d ed. 1984).
[160] See Smith v. State Farm Fire & Casualty Co., 633 F.2d 401, 403 (5th Cir. 1980), citing United States v. Beechum, 582 F.2d 898 (5th Cir. 178) (en banc).
[161] Id.
[162] Id.

(1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or element of the offense. (3) The evidence must be reliable. And (4) The evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the fact-finding process.[163]

Courts have determined that evidence of prior fires is not relevant unless it has been proven that the insured actually participated in the prior arson or there is at least a showing that the fire was of incendiary origin and that the fires were similar in their circumstances or in time to the subject fire.[164]

In this case, there is no evidence that Mr. McKean participated in any of the fires, that any of them were incendiary, or that there is any similarity between any

---

[163] See Westfield Ins. Co. v. Harris, 134 F.3d 608, 614 (4th Cir. 1998) (citations omitted).

[164] See Warner v. Transamerica Ins. Co., 739 F.2d 1347 (8th Cir. 1984) (where court affirmed ruling that where there was no evidence to suggest that the prior fire was of incendiary origin or that plaintiff had anything to do with starting it, the evidence's slight probative value was outweighed by the possible prejudicial effect of the testimony). See also Owens v. International Bus. & Mercantile Reassurance Co., supra, (where no evidence existed which suggested that the prior claim was fraudulent, evidence of such prior claim was properly excluded at trial). See also Smith v. State Farm Fire & Casualty Co., 633 F.2d 401 (5th Cir. 1980) (affirming that evidence of other fires was inadmissible as relevancy was highly questionable and greatly prejudicial since there was an inadequate showing that the prior fires were incendiary in nature and were similar to the subject fire).

of the fires.  Evidence of other fires at plaintiffs' other properties is not only irrelevant to any claims or defenses asserted by the parties but it is also not necessary to such claims or defense in this case.  To the contrary, such evidence would only prejudice the McKeans and mislead the jury.  This is why the Court refused to allow the defendant to introduce this evidence initially.  Therefore the statement in the 911 call about other fires permitted the jury to know and consider this fact that the Trial Court already determined was prejudicial.

### D. THE TRIAL COURT ERRED IN ALLOWING DEFENDANT'S FIRE AND ARSON EXPERT TO TESTIFY REGARDING A RAG BECAUSE THERE WAS NO MENTION OF A RAG IN HIS PRE-TRIAL REPORT

The Trial Court erred in allowing Thomas Jones, defendant's fire and arson investigation expert, to testify regarding a burnt rag allegedly found during his investigation.  There was no mention of a rag in Mr. Jones' reports which severely prejudiced the McKeans from preparing for testimony.  Despite not having any mention of a rag in his reports, Mr. Jones was permitted to testify to information and reach conclusions that were outside of his report.

In Sucharski v. Patel,[165] the Court noted that "[t]he experience of this Court has been that it is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular

---

[165] 2014 U.S. Dist. LEXIS 2713, 70-71 (E.D. Pa. Jan. 8, 2014)

facts and circumstances of each case. The controlling principle which must guide us is whether the purpose of Rule 4003.5[166] is being served. The purpose of requiring a party to disclose, at his adversary's request, the substance of the facts and opinions to which the expert is expected to testify is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony."[167]

"In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word fair. The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response."[168]

Here, Mr. Jones was permitted to claim that the rag was an origin of the fire. Nowhere in his reports was there any mention of the fire originating from the

---

[166] While the case cited originates from State Court, the analysis is instructive.

[167] See Augustine v. Delgado. 332 Pa.Super. at 199, 481 A.2d at 321 (Pa.R.Civ.P. 4003.5 favors liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise); Martin v. Johns-Manville Corp., 322 Pa.Super. at 358, 469 A.2d at 659 ([W]e have found experts' reports to be adequate ... when the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness).

[168] Wilkes-Barre Iron & Wire Works, Inc. v. Pargas of Wilkes-Barre, Inc., 348 Pa. Super. 285, 502 A.2d 210, 212-213 (Pa.Super. 1985).

rag.[169]   Mr. Jones was permitted to conclude that the claimed origin of the fire started from the rag which was not ever part of his pre-trial report. As a result, the McKeans were unfairly surprised with the new conclusions which severely prejudiced them during trial.

### E. THE TRIAL COURT ERRED BY NOT ALLOWING THE MCKEANS TO REFUTE THOMAS JONES' OPINIONS ON CROSS-EXAMINATION WITH CERTAIN "JUNK SCIENCE" ARTICLES REFUTING HIS METHODOLOGY IN INVESTIGATING THE FIRE

The Federal Rules of Evidence require the trial judge to ensure that any and all expert testimony admitted is "not only relevant, but reliable."[170] The court of appeals has stated that "an expert's testimony is admissible so long as the process or technique used in formulating the opinion is reliable."[171] The main goal is to exclude so-called "junk science" and ensure that expert testimony is based on sound methods and valid procedures.[172]

As a general rule, "the reliability threshold is a low one."[173] "[A]n expert opinion must be based on reliable methodology and must reliably flow from that

---

[169] P 602-635.
[170] Daubert v. Merrell Dow Pharms., 509 U.S. 579, 589.
[171] Pineda v. Ford Motor Co., 520 F.3d 237, 247 (citing In re Paoli, 35 F.3d 717, 742).
[172] Lentz v. Mason, 32 F. Supp. 2d 733, 745 (D.N.J. 1999), citing 4 Weinstein's Evidence Section § 702.05[3].
[173] Hamilton v. Emerson Electric Co., 133 F. Supp. 2d 360, 370 (M.D. Pa. 2001).

methodology and the facts at issue-but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production."[174]

In evaluating whether a particular methodology is reliable, and reliably applied to the facts, we may consider nonexclusive factors such as the following; (1) whether the method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[175]  In addition, the trial court may also consider "independent, non-Daubert reasons" to evaluate expert testimony.[176]

If the proposed opinions and conclusions are based on "good grounds" then the expert testimony is reliable.[177] To determine whether good grounds are present, the court must examine the expert's conclusions to see: "whether they could reliably flow from the facts known to the expert and methodology used."[178] The

---

[174] Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir, 1999).
[175] Paoli, 35 F.3d at 742 n.8.
[176] Hamilton v. Emerson Elec. Co., 133 F. Supp. 2d 360, 374-75, (M.D.Pa. 2001).
[177] Paoli II, 35 F.3d at 748.
[178] Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999).

focus is on the reliability of the methodology as opposed to the merits of the conclusions drawn.[179]

In the present case, the Trial Court failed to allow the McKeans to demonstrate to the jury that Mr. Jones' methodology had been questioned and proven to be inaccurate, as referenced in not just the 1999 article[180] but also in case law that has been published shortly after the trial.[181]  Specifically, the McKeans were not permitted to compare Mr. Jones' investigation in their matter with a previous matter in which he employed the same flawed investigative tools.  This was a classic "battle of the experts" case.  By not permitting the McKeans to fully cross-examine defendant's fire expert, the Trial Court prejudiced them from, in essence, defending themselves against the charge of arson.  Without a full record from which to consider the case, the jury had no choice but to find against the McKeans and for the insurance company.

In addition, the Trial Court erred by stating that the article the McKeans sought to introduce did not state what counsel represented it to state.  As mentioned above, on cross-examination the McKeans attempted to highlight by way of an article written by an association of which Mr. Jones is a member that an investigation by Mr. Jones was tainted when he improperly opined that there were

---

[179] See Paoli II, 35 F.3d at 742; In Re TMI, 193 F.3d at 664.
[180] P 636-641.
[181] P642-660.  This case law is submitted solely to illustrate what should have occurred at the McKean trial.

multiple points of origin at a fire scene, which is the exact issue in this case. Upon objection by defendant, the Court refused to permit this inquiry.[182] The Court then instructed the jury that the articles cited by the McKeans "do not support the question [asked of Mr. Jones during cross-examination] and they do not warrant an answer...So that question was inappropriate. It wasn't supported by those documents, those documents will not come into evidence, and you are to put them out of your mind, as well as any potential answer you anticipated Mr. Jones giving. The question was inappropriate."[183]

However, the article did state what the McKeans represented. The article in question, titled "A Calculated Arson," concerned a fire investigation in which Trooper Jones was the lead investigator which ultimately led to a conviction of Han Tak Lee for arson. One of the "key words" listed in the article is "junk science." The author writes:

> The purpose of this article is to acquaint readers with some of the methods *still* used by some fire investigators to obtain convictions. These methods pretend to be founded in science, but are in fact founded only in mythology and pseudo-science. This fire investigation and subsequent trial demonstrate that a practiced expert witness with a straight face and a file full of "quantitative" data is capable of convincing an untrained jury and judge of just about anything.[184]

---

[182] P 271-275, 71:18-75:6.
[183] P 276, 76:3-76:12
[184] Id.

The article examined the facts of the <u>Lee</u> matter as well as the trial testimony provided by Trooper Jones and others. Similar to the McKeans' matter, Trooper Jones improperly found there were multiple points of origin which, as a result, caused him to classify the fire as arson. The author refuted each of Trooper Jones' opinions, and concluded the article by writing, "Much has been written lately about the criminal justice system allowing guilty people to escape justice due to sloppy police work. Here is the case of the wrongful conviction of an innocent man, surely a worse result. The Lee case represents the ultimate triumph of junk science."[185]

The article was proven correct, as less than a month after the McKean trial ended, United States Magistrate Judge Martin Carslon of the Middle District of Pennsylvania recommended that Mr. Lee's conviction be overturned due to the junk science engaged by Mr. Jones, which is the exact same junk science that the McKeans were not permitted to explore. That recommendation was accepted by United States District Judge William Nealon, Jr., who ultimately provided Mr. Lee the ability to obtain bail after being in prison for approximately 25 years.[186] Had the <u>Lee</u> matter been before the McKean Court, Mr. Lee would most likely still be in prison for a crime he did not commit. Conversely, had the McKean matter been

---

[185] <u>Id.</u>
[186] A copy of the opinions is attached as P 642-660.

before Judge Carlson, the McKeans would have been permitted to discredit Trooper Jones' theories, and the jury would have reached a different result.

This admonition of the McKeans' counsel by the Trial Court had the unfortunate consequence of misstating the article, bolstering Mr. Jones, and demeaning the McKeans' counsel in the eyes of the jury. Any of these items should be enough to vacate the jury's decision and remand this matter to the Trial Court for a new trial.

**F. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY INSTRUCTING THE JURY THAT DEFENDANT'S COUNSEL'S QUESTION CHARACTERIZING THE FIRE LOSS SCENE A "CRIME SCENE" WAS APPROPRIATE**

There is no bright line separating remarks that are appropriate from remarks that may unduly influence a jury. Although not explicitly articulated, the Third Circuit has balanced a number of factors and has employed what might be termed a sliding scale approach to assess the propriety of a trial judge's comments during a charge to the jury. Specifically, this Court has considered four factors: the materiality of the comment, its emphatic or overbearing nature, the efficacy of any curative instruction, and the prejudicial effect of the comment in light of the jury instruction as a whole.

Here, during defendant's cross-examination of Lieutenant Myers, defendant's counsel asked him "It is important that crime scenes be preserved?"[187] The McKeans immediately objected, and defendant's counsel then offered to withdraw the question because it is clearly prejudicial to discuss a "crime scene" in a civil case for insurance proceeds.[188] Withdrawing the question did not cure the prejudice, but rather than address that, the Court stated, "As far as I'm concerned, the question was appropriate,"[189] thus clearly suggesting to the jury that the Court felt that this was a crime scene and by extension that the McKeans engaged in arson.

On appeal, the materiality of the challenged comment is a preliminary focus of inquiry. The reviewing court should be more concerned with a comment on a matter central to the defense than with a comment on a tangential issue.[190] The fact that the judge in Anton commented on the defendant's credibility, an issue "central to his defense," was one factor in this Court's reversal of the conviction.[191]  In the present case, calling the fire loss scene a "crime scene" suggested that the McKeans committed arson, the central issue in the trial.  Either the fan caused the fire or the fire was intentionally set.  For a Judge to say that it is appropriate to call

---

[187] P 514, 105:8.
[188] P 514, 105:9-105:10.
[189] P 5143, 105:12-105:13.
[190] See United States v. Anton, 597 F.2d 371, 374 (3d Cir. 1979).
[191] Id.

the McKeans' home a "crime" scene suggests only one thing to the jury, that the Trial Court is convinced that Mr. McKean set his house on fire and that the jury should also believe that.

A second consideration for the reviewing court is the strength of the challenged comment. The reviewing court must be concerned with "emphatic or overbearing remarks" that a jury may accept as controlling.[192] For example in Anton, the trial judge commented that he regarded the defendant "*as devoid of credibility*" and that he did "*not believe [defendant] absolutely and in all respects.*" Thus, in Anton, the emphatic nature of the judge's statement provided a second ground for the reversal of the jury verdict.[193]

The efficacy of any curative instruction must also be considered. In many cases, a trial judge's comment which potentially could constitute reversible error can be counterbalanced by a curative instruction.[194] For such an instruction to be effective, the judge must clearly explain to the jury that it is free to disregard his remarks and must determine the facts and decide the case on its own. Both the number and clarity of such instructions are to be considered.  Here, there was no curative instruction.

---

[192] United States v. Gaines, 450 F.2d 186, 189 (3d Cir. 1971).
[193] Id. at 374.
[194] See, e.g., United States v. Blair, 456 F.2d 514, 519 (3d Cir. 1972).

Finally, the reviewing court must assess the prejudicial effect of the comments in light of the jury instruction as a whole. A potentially prejudicial comment cannot be evaluated in isolation, out of context. Rather, the reviewing court must examine the entire jury instruction to assess the true impact of the challenged remark.[195]

Under the sliding scale approach the reviewing court must balance the above-mentioned factors. The stronger the potential prejudicial effect of a statement is, the stronger must be the mitigating factors. There may be cases in which the trial judge's comments are so out of bounds that no cautionary instruction to the jury could remove their prejudicial effect. For example, in Anton the Third Circuit held that the judge's statement of utter disbelief as to the defendant's credibility constituted reversible error. Despite clear curative statements before and after the comment, the Court stated that "[where] a court has expressed its opinion on a pivotal issue in the case, and has expressed that opinion in a strong, unequivocal and one-sided fashion, abstract instructions regarding the jury's role as fact finder are not a sufficient remedy."[196]

In the present case, the trial court's comments were analogous to those stated in Anton. Advising the jury that the questioning of defendant's counsel which alluded to a "crime scene" was appropriate was severely prejudicial to the

---

[195] See United States v. Gaines, 450 F.2d 186, 190 (3d Cir. 1971).
[196] Anton, Supra 597 F.2d at 375

McKeans.   In fact, such a comment to the jury implicitly suggested that the McKeans committed the crime of arson and are not entitled to collect insurance proceeds.  Such comment is reversible error.

## CONCLUSION

For the reasons set forth above, the cumulative errors by the Trial Judge did not allow the McKeans to have a fair trial.  As a result, the Trial Court committed reversible error and this matter must be remanded to the Trial Court for a new trial.

Respectfully submitted,

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY

Jeffrey P. Resnick, Esquire
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: (856) 662-0700
Facsimile: (856) 488-4744
Counsel for Plaintiffs/Appellants

DATE:  September 9, 2014

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies pursuant to Third Circuit Rule 46.1 that the undersigned was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit, and is presently a member in good standing at the bar of said court.

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I hereby certify that the foregoing Brief complies with the type-volume limitation of the above referenced Rule because it contains 12,410 words of text in Times New Roman, 14 point font from the introductory paragraph through the conclusion. The word count was obtained from the word count tool contained in Microsoft Word® 2003.

Pursuant to Third Circuit Rule 31.1(c), I hereby certify that the text of the electronic version of the Brief of Appellants is identical to the text in the paper copies of the Brief of Appellants. I also certify that a virus detection program, Symantec Norton Anti-Virus Security, has been run on the electronic version of the Brief of Appellants and that no virus was detected.

DATE: September 9, 2014

_____
Jeffrey P. Resnick
*Counsel for Plaintiffs/Appellants*
*Stephen and Michele McKean*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 9, 2014, I filed the Brief

of Appellants with the Clerk of the Court, United States Court of Appeals for the

Third Circuit, via ECF and hand delivery and served copies of the same, via ECF

and United States First Class mail, on the following person in the matter shown:


Charles E. Haddick, Jr., Esquire
Dickie McCamey & Chilcote, P.C.
Plaza 21, Suite 302
425 North 21st Street
Camp Hill, PA 17011
*Attorneys for Defendant/Appellee,*
*Nationwide Insurance Company*


DATE:  September 9, 2014

_____
Jeffrey P. Resnick
*Counsel for Plaintiffs/Appellants*
*Stephen and Michele McKean*